Outsourcing Facilities v. FDA The second case on our docket this morning is 25-10600 Outsourcing Facilities Association v. Food and Drug Administration. Mr. Grossman. Good morning. Andrew Grossman for the appellants, and may it please the court. The FDA's action removing True's Epitide from the drug shortage list established a prospective legal prohibition on compounding for an entire industry. That was a rule, and it is invalid because it was issued without notice and comment. It cannot be an adjudication. The defendants in this case don't even contend that there was any party before the agency. This would be the first party-free adjudication in the history of the Administrative Procedure Act. The delisting action is also invalid as a matter of substance. FDA's briefing says over and over again that its decision determined whether one number, supply, was bigger than another, demand. But the decision doesn't identify either number, neither does the FDA's briefing. Meanwhile, Lilly's supply and demand numbers showed multimillion-dose shortfalls in the most recent months preceding and succeeding the decision. But FDA missed that entirely because Lilly hit it in a 15-month cumulative count, where a shortage is measured by cumulative supply and demand over time, where to start counting and where to stop counting control the outcome of that determination. But the FDA never made any finding with respect to the proper time period for counting. To the extent that it accepted Lilly's 15-month cumulative count, it never explained why a completely bespoke 15-month analysis makes any sense, especially under a statute that requires an up-to-date determination. Yet the FDA relied on Lilly's showing to dismiss out of hand every single other piece of evidence submitted by anyone other than Lilly, all of which pointed to an ongoing shortage. And that includes evidence of widespread and persistent unavailability of trisepatide products from the major drug wholesalers, the three major wholesalers that serve as something like 90% of the market. FDA's unreasoned acceptance of Lilly's gerrymandered showing is the height of arbitrary and capricious agency conduct, and it should be vacated. How long does it typically take to begin and end a rulemaking process? So that can vary, Your Honor. It can be anywhere from as little as a bit over a month to, I mean, we've seen literally instances where it's taken years. There is no requirement for a comment period of a particular length in the FDA. Kind of the default rule of thumb is 30 days. But the D.C. Circuit has approved comment periods as short as seven days, where a statute called for an expeditious determination. So the agency would have a lot of flexibility. And, of course, agencies can act even more quickly under the good cause exception to notice and comment provided in Section 553. So there is no, I think, one answer to that question, other than to say that where there is a need to move expeditiously, the law does accommodate that need. It would seem that this just seems to me would create an anomalous statute, where you have a statute saying you have to determine whether there's an up-to-date determination or whether there's a shortage. But then that's a rulemaking, you say. And you're saying, well, you could always use the good cause exception to notice and comment to do the rulemaking. Why would you design a statute that way? So, Your Honor, I don't think there's an anomaly in this. Because if you actually look at the statutory scheme, it contemplates this process playing out, in other words, the initial listing process, over a period of months. So the statute requires that a manufacturer notify the FDA at least six months before things like discontinuations and other sorts of disruptions that may lead to a shortage. There are other provisions in the statutory scheme that contemplate a notice and response procedure between the FDA and the manufacturer that plays out over a period of several months. So while the facts, in some cases, may require a quick-draw determination that there is, in fact, a shortage and that's happening immediately due to some unforeseen events, nobody has ever contended, in this case, that that is the normal scenario. And indeed, there are many instances where a drug manufacturer has simply discontinued manufacture of a drug or where a factory has been taken offline for maintenance or things of that nature. And that, in turn, has led to a drug shortage. So it seems to me that if you look at the statutory basis for finding a—the enumerated basis for finding a shortage, many of them, perhaps most of them, would be perfectly amenable to notice and comment rulemaking without any need for exercise of the good cause exception. Mr. Grossman, was that answer to Judge Duncan—are you saying that it was erroneous for the FDA not to do notice and comment on the original listing decisions in 22 and 24? The agency—we haven't taken a position on that. The agency may or may not have been able to invoke the good cause standard to forego notice and comment. What I will say is that—two things. First, those decisions aren't before the court. You know, they aren't simply part of what's been challenged in this case, so they're outside of the court's jurisdiction here. And second, the basis for the delisting action was not that there was some legal error or defect in the initial legal action. So, you know, under just the standard Chenery rule, the agency would actually have to make that determination for the court to uphold the delisting action on that basis. But you recognize that, obviously, we have to come up with a rule. And we would—you know, and that rule is going to have future effect and application in new circumstances. And either one of them seems to be—I guess we'll stick with the theme of anomaly—seems to be anomalous. Either we say, look, this was—should have been done through notice and comment on the delisting, which would then lead to a sort of two-part question, which is, one, was the original question, should it have also been done through notice and comment of some kind? And maybe you can say, well, look, there's a 553B exception for, you know, good cause for notice and comment, but it would still be a rule, right? We would still expect that in the next set of circumstances, the original FDA listing actions would be done through rules, not adjudications. That would be point one. Or point two, which is perhaps even more anomalous, is that we would say, no, it's totally fine to have a mismatch, right? You can do one through an adjudication, and you can do another through rulemaking. Either one of those seem to be tough pills to swallow. Your Honor, we're not arguing that there would be a mismatch here. I mean, that's not the position that we've set forward. What we're saying—what we have said is that the agency would have flexibility at the outset of a listing determination, and it may well be able to rely upon the good cause exception in certain instances. But I think the issue for the Court is that the agency would actually have to reason through that, and the agency has never done that here. So we're not asking the Court to say, well, you know, heads I win, tails you lose. We agree that it probably—that it would probably work the same for both types of actions, but how that plays out in any given case can vary based on the agency's reasoning and application of things like the good cause exception. I'd like to talk about the defendant's argument that the sorts of determinations that are made here are simply— under the statutory scheme are simply incompatible with notice and comment rulemaking. First of all, the standard for incompatibility, in other words, where something that otherwise operates as a rule is regarded as— is nonetheless not subject to notice and comment under the APA, is subject to Section 559's requirement that a statute expressly override the APA's default procedural requirements. The defendants cite two bases for this argument. One is simply the up-to-date requirement, which, as I discussed, is no barrier to undertaking notice of comment in the mine run of cases. And the second are simply confidentiality provisions that are generally applicable confidentiality provisions of law, one in the APA, one in Title 18, that apply across the board to all sorts of regulatory actions. And so I don't think that those can provide a basis to say that the statute expressly overrides the APA. And in addition, they also— those same explanations demonstrate why there is no incompatibility in this instance. There's no reason that an agency can't— the FDA can't, in the usual case, undertake notice and comment rulemaking. I also mentioned earlier that this would be, so far as I'm aware, and certainly so far as any of the briefing here demonstrates, the absolute— you know, under defendants' argument that this is an adjudication, the absolute first case to hold that you can have an adjudication without a party before the agency. You know, we pointed out that there— unlike other instances of adjudication, there was, in this case, no, say, compounder before the agency, where the agency was determining, well, was that compounding you were doing in the past? Was that lawful or was that unlawful? And in the course of making— undertaking that sort of adjudication, sure, an agency can come up with, you know, some interpretation of law or application of law that then, via stare decisis, would be broadly applicable. But that's not what the agency did here. The agency simply declared that, going forward, the law was going to be different and that an activity that was lawful for an entire industry was now going to be unlawful and, indeed, subject to criminal penalties, potentially. That is not like any adjudication in the history of the APA. I mean, ever since, at the latest, Wyman Gordon in 1969, the Supreme Court has made clear, and the lower court's case law has reflected this, that if an agency is going to come up with some new requirement— Well, it's not really a new requirement. I mean, the statute clearly says the person who develops this has five years when they don't have to compete, essentially, unless there's a shortage. And so it's not like you're saying it's unlawful. It's a discrete determination at a point in time where compounding is allowed. And when the shortage ends, compounding is no longer allowed. So it's a little bit different than saying it's unlawful going forward forever. I mean, it's a discrete determination, it seems to me. Well, so two points, Your Honor. First, this sort of triggering mechanism, whether you're saying existing prohibition in the statute that's triggered by a listing or delisting type action is quite common. And second, those types of listing and delisting actions are often very factually intensive. I would point to, for example, the many fact-based determinations that the EPA makes under the Clean Air Act and the Clean Water Act that can include, for example, listing different types of source categories as emitting certain— You think those can get resolved within five years? I'm sorry, Your Honor? Some of our cases involving clean air and clean water have gone on for years without resolution. Yes, sometimes the litigation can take a longer time. But I think at the end of the day, that one would hope that there would be less disputes and better decision-making by the agency if it undertook the procedure that Congress specified for promulgating these types of determinations. Your point is that those EPA activities are rules? They are rules. And they're treated as rules in the rulemaking process?  So, I mean, what I was going to ask— that's along the lines that I was going to ask. I mean, this seems to me awfully impressionistic. I mean, I think we have to accept that there is such a thing called rulemaking and there's such a thing called adjudication, right? I mean, those are recognized categories. And that rulemaking has to go through notice and comment, but adjudication doesn't, right? We all agree with that, right? So we have to figure out what bucket— I hate that term— what category to put them in. So how am I— so if I—let's assume also that the label that the agency gives it is of minimal value. What am I supposed to do to say, well, this is a rulemaking and not an adjudication? What am I supposed to look to? Because there is an argument, and they're making it, that this is an adjudication because what you're doing is you're taking an established standard that the statute sets forward and you're saying, I'm going to adjudicate whether that standard is met at a particular point in time with respect to a bunch of facts. Sounds like an adjudication. What's your response? My response is that that describes possibly dozens of statutory schemes that involve the same sort of listing process. There's no difference— And those are rulemaking? Those are all rulemaking. Okay, so give me an example beyond the EPS. So what would be the statutory scheme at issue in Mann Construction and Green Rock where the IRS identifies potentially abusive transactions and then lists them, and then there are a variety of regulatory consequences that are in the statute that flow from that listing? That's an inherently factual inquiry. Another one would be, for example, Clean Air Act Section 112, twice over, in fact. Under 112B, the agency lists certain hazardous air pollutants, so it has to apply a statutory standard to determine whether, as a factual matter, certain types of emissions are hazardous. It's an intensive factual issue. And then under Subsection C, it then has to determine whether certain categories of sources omit those listed hazardous emissions. These are about as factual as you can imagine. Like, literally, it's a certain type of plant omitting a certain type of emission. But nonetheless, those are understood to be rules because they don't have the fundamental characteristics of an adjudication. You know, I would point to... Well, give me an example, then. I take your point. Give me an example of an adjudication that shows that this, what we're talking about here, is not an adjudication. What's a great counterexample? Any sort of enforcement action before an agency where the agency is looking backwards at a regulated party's conduct and comes up with a new rule based on the statute or something like that, and then that new rule applies via stare decisis to potentially other parties. But the key point is that the agency, having decided on a new approach, a new law, effectively, then applies that to the party before it. I mean, that really was the basis of the Supreme Court's holding in Wyman Gordon, that what the agency claimed to have been, you know, an adjudication there that established a new procedural requirement actually did no such thing because the agency merely announced the new requirement without applying it to the party before it. I would also direct you to Justice Scalia's concurrence in Bowen that recognizes that this dichotomy between rulemaking and adjudication is really the fundamental dichotomy of the APA and that the way that you have to think about this is, for an adjudication, are we talking about the application of a law to a party based on that party's prior conduct? If so, that is an adjudication. If not, and the agency is merely announcing some standard that applies on a prospective basis, as here, that is a quintessential rulemaking. And if the Court does not observe that line, there simply is no limiting principle to the defendant's position in this case. And why does that line not counsel in favor of adjudication? I mean, they look and they say, Eli Lilly spent $23 billion, they do this, increases, they've got the new thing instead of just the single-use, they have the single-use files now instead of just the little injectable pen. And so they're looking at the past stuff that's been going on that Eli Lilly did to address the shortage and saying, yes, that meets the standard. How is that not sort of like a licensing proceeding or an enforcement proceeding, or as you're saying to Judge Duncan, an adjudication in that sense? Well, there's no license, at least within the meaning of the APA that I'm aware of. Obviously, it's not a licensing proceeding. It's like one is what I'm trying to say. It's like you're looking at Eli Lilly's conduct, what they did to address the shortage, and you're saying you did good. Thumbs up. I mean, for what it's worth, even the agency doesn't think that Eli Lilly was a party before the agency in this proceeding, and so I think that's a problem. But even beyond that, this doesn't really affect, it affects Eli Lilly's interests, I think we can see that, but I don't think it affects Eli Lilly's rights because Eli Lilly is not the party that is subject to potentially administrative proceedings and prosecution under the statutory scheme once a substance is removed from the shortage list. If the Court has no further questions, I would reserve the remainder of my time for rebuttal. Thank you. Thank you. Good morning, Your Honors. May it please the Court. Caroline Tan for the government. I thought it might be helpful to start with the APA's definition of rule here and to work from there. If you go to 5 U.S.C. 551, the APA defines rule as something that implements, interprets, or prescribes law or policy, and it defines adjudication as functionally everything else. If you look at what the FDA did here, no part of that decision interpreted law or policy. FDA took the statutory definition of shortage and applied it to the facts on hand. FDA did not make any prescriptive or normative judgments about what should happen, and FDA's decision with respect to this drug provided no guidance as to future shortage determinations. Each time, all FDA does is take the definition that Congress provided and consider the facts at hand. What's your response? Sounds like one of the principal arguments was there was no party here. How can you have an adjudication with no party? What's your response? I have two responses, Your Honor. The first is the APA. There's no requirement in the APA that there be a party in adjudications. It's true that a lot of adjudications happen to have parties, but the relevant point is that an adjudication has an immediately binding consequence on individuals, and that's what we have here. The moment FDA made its determination that the shortage was over, the statute triggered a bunch of additional consequences, and that's actually... It's a lot of people it had an effect on, right? A lot of companies it had an effect on. Anyone who was compounding. I don't know how many companies that is. Presumably it's... I don't know. Is it a lot? I mean, it certainly affects a number of people. I would say the same is true when FDA approves a new drug application, and there's no dispute that that is an adjudication, and everyone in the dispute agrees with that characterization. So the mere fact that it's broadly applicable similarly doesn't render something a rule. I think the real point, which comes from the definition of rule in the APA, is whether the agency action is interpreting or prescribing lower policy. I'm happy to discuss the reasonableness of FDA's decision here. Yeah. We'll probably get to that since we have two arguments back-to-back on the same thing, but Mr. Grossman made the point that, look, when EPA is classifying, I don't know, water, air stuff with respect to the Clean Air Act and all this stuff, we handle those cases. Those are obviously factually intensive determinations. Goodness gracious, I mean, when we're reviewing the administrative record and that it's 20,000 pages, and yet those are rules. Why isn't this a rule in that same sense? So I'm not that familiar with that scheme, but there are circumstances where Congress directs the agency to undertake certain determinations by rulemaking, and my sense is that's probably what's happening in those cases. For what it's worth, Congress similarly required rulemaking for other circumstances involving compounders regarding clinical need, but did not do so with respect to shortage determinations, and I think that distinction... Say that again. So in 21 U.S.C. 353B sub A to capital A, lowercase I, understood. Congress said that when, for some compounding determinations or for some activities regarding compounding, Congress did say you need to go through notice, comment for certain things regarding clinical need and bulk drug compounding. I think the specifics are laid out if you look at that provision. The relevant point is just that there is a provision in the scheme that says rulemaking for this stuff, and there is no similar provision that says rulemaking with respect to shortages, and I think that makes sense. I mean, I think rulemaking would be incompatible with the directive that the secretary keep this list of drugs and shortage up to date, and also that the secretary respect confidential business information and trade secrets when doing so. Well, the other side says you can just use a good cause exception to notice and comment. I mean, I think the fact that they, there's no reason to think why that would be a sensible reason to write a statute that every time you want to do this you have to rely on an exception. I think, and if you look again at what the agency did here, all they did was take Congress' definition and apply it to a particular set of disputed facts. That is a classic adjudication. Ms. Tan, I was struck that, and Mr. Grossman points this out in his reply brief, that Eli Lilly makes a powerful argument that whatever we call it, rulemaking, adjudication, that there's no prejudicial error because everybody in the world had notice of this for two months. You know, there was a public announcement by FDA in October of 2024. Everybody had until mid to late December of 2024 to submit comments and, you know, and all of the various things that go along with notice and comment. We identified the legal rule. We talked about the thing we were thinking we were already beginning to do. We solicited public input. Then we provided a response memorandum. That seems like the kind of thing that one would get through MNC. But FDA didn't join in that argument, Mr. Grossman points this out in his reply. I'm curious why. Do you think that if we disagree with you, we have to reverse? So I think one of the distinctions is it's difficult, if not impossible, for FDA to undertake meaningful notice and comment for these kind of determinations because the core set of information that is relevant to this dispute is confidential business information. It's how much was Lilly making? You know, how do we look at various snapshots of this data? And that's not something that FDA is permitted to disclose publicly. And so in order to do meaningful notice and comment proceedings, I think, in theory, the ideal way is FDA would say, Well, you've made X amount of drugs in this month, Y amount of drugs in that month. Everyone now tell us whether or not you think that's a shortage. And that's not the sort of thing that FDA is able to do and that Congress specifically directed FDA not to do. So I think we agree to the extent that plaintiffs' main concern is they weren't able to provide their opinions or their thoughts on whether or not there was a shortage to the agency, that that's not true in this case because they did have that opportunity. I was going to ask about that. Given the confidential nature of this information, how is it that counterparties to, I know they're not counterparties, but people who are interested in there still being a shortage, how is it that they get their views before the agency? So there is a general compounding docket that's available on the FDA's website that patients, pharmacies, compounders can use to submit information about their ability to get a certain drug at a given point in time. And my understanding is that individuals, including compounders, have used that docket to supply information to FDA. So that process is always available. And with respect to the decision here, FDA also opened up an additional period of commenting for you to submit evidence, of course did not disclose the confidential business information, which would be contemplated by robust, meaning notice and comment. Is that information in the record before us? Yes. I think the decision memo talks in detail at the latter half about the various comments that FDA received from compounders, pharmacies, et cetera. Thank you. What about their specific attacks on the Eli Lilly's information, how it was formatted and how it doesn't support the funding? So a lot, I think for the most part, my friend on the other side misses the forest for the trees. They focus a lot on the way the data was presented, on various aspects of different tables. But if you look at, you know, I think table four is a particularly helpful table on page 3974 of the record. It shows you that consistently over a meaningful period of time, Lilly had both met wholesaler orders and had a significant amount of surplus after meeting orders. And that surplus wasn't just small. It was a comfortable margin. And when evaluating whether or not Lilly is able to meet demand, one of the critical components is whether they have enough supply on stock in order to meet consumer orders. And so I think this, you know, it's a thorough memo. If you look at it from page one to page 32, you'll see that the agency took zoomed in views, what was happening with this particular market as well as zoomed out views. And, you know, my plaintive sort of arguments don't really undermine the thoroughness of that reasoning. I'm happy to talk about any specific argument if you'd like. I'm going to ask that you affirm. Thank you. You'll be back. Yes, I'll be back. Good morning, your honors, and may it please the court, Erin Murphy on behalf of Eli Lilly. FDA's December 2024 conclusion that Lilly's supply of trizepatide medicines was now sufficient to meet demand is both reasonable and reasonably explained. In fact, the conclusion FDA reached is obviously correct as it's now been 14 months since this decision was issued and neither of these medicines has been found on the shortage list since. Plaintiff's efforts to find fault with a decision that has proven true as a matter of fact distort administrative law principles and obscure the record here. I'll start by saying, you know, we certainly agree with what the government has already said about rulemaking versus adjudication. This was a perfectly appropriate situation to act through adjudication. The very cases plaintiffs are relying on repeatedly say that the core distinction between adjudication and rulemaking is rulemaking is about making law or policy where adjudication is more about findings of fact. Now, these aren't, you know, hermetically sealed categories. Certainly you have facts in the rulemaking context and law can be made in the adjudication context, but that's really kind of the core distinction about why you go through one process versus the other. And this proceeding was all about fact. And particularly, you know, their argument just makes very little sense when you step back and understand this statutory scheme as a whole. This may be a shortage that was more reflective of some broader demand issues, but a lot of instances of drugs going on and off the shortage list have to do with very specific things like a particular facility. You know, there's a natural disaster that takes something offline so that there's an ingredient that's not available. It makes no sense to think that Congress wanted the agency to have to stop, do notice and comment, ask everybody's views about whether that particular medicine should go on a shortage list, especially when you have a statutory provision here that says that the agency doesn't even have to tell the public at all about whether drugs are going on the shortage list. So this just is not a context in which it makes sense for that to be the required procedure. But in all events, it's a particularly poorly positioned set of plaintiffs to be complaining about not getting enough process here when there was a vacatur and remand to the agency voluntarily for the precise purpose of giving these plaintiffs a chance to put all the evidence that they wanted to put before the agency. They put hundreds and hundreds of pages of material that's in the administrative record here that they submitted to the agency. They represent in their briefing that they had opportunities to go in and talk with the agency about their concerns, and the agency spent roughly half of its opinion going through why it considered their evidence, looked at everything that they presented and others presented, but just didn't find it particularly persuasive. So I think in that context, I don't think it would make sense to adopt a rule that this has to be done through rulemaking since that would have to be a universal rule across both listing and delisting and would seem to have to apply in every context so you'd have the agency invoking good cause left and right. All that just goes to show it's a very poor fit here, but certainly not a basis to disturb what the agency did as to this particular case. I'll just say a few words about their arbitrary and capricious arguments. Of course, happy to answer any questions the court has about it, but the core problem, I mean, most of their arguments stem from the idea that there's something problematic about looking at cumulative information. In fact, it would have been the height of arbitrary and capriciousness to not look at cumulative information here because the reality that nobody seems to deny and you can't deny is product manufactured in one month, if it's not used to meet demand in that month, can be carried over and used the next month. And that's why we're providing cumulative information, explaining to the agency, here's what we have actually supplied to the market, but here's what we also have in finished inventory that's available for us to use next month, if supply is higher. So Lilly's working to build excess inventory precisely so that it can be ready to meet demand as demand is increasing. And that's why the agency was looking correctly at cumulative information. It was looking at what do you have? What are you manufacturing now? What are you supplying now? But let's also look at this as a trend over a longer period, see if it's increasing, see how you've done month to month. Let's look at today, let's look at yesterday, and let's look at you. We're gonna have you continue to provide us information on a biweekly basis going forward on the off chance that we've gotten it wrong. So it's hard to see how an agency could act more reasonably in this context than saying, hey, give us more information. We wanna be sure we understand everything that you're looking at and keep providing us information on an ongoing basis. And the one thing I'd encourage you to take a close look at in the record is there's a set of correspondence on November 5th and December 6th of 2024. You can find these starting at 2861 and 2904 of the record. It's back and forth where the agency asked Lilly dozens of questions, the exact kind of questions plaintiffs are proposing. What did supply represent here? Why did you do it this way? Could we also see it this way? Can you give us some different formulations of this information? Hey, this looks like a different measure of inventory than that one. Help us understand why these numbers might be slightly different. So this is not the agency blindly just saying whatever you take, we'll agree to that and just write it down as if it's our decision. There was incredible back and forth. The agency took real time and effort and care to ensure that understood the data before it, to get more data where it didn't think that was sufficient and took that extra step of saying, even though we've decided there's no longer a shortage, we're gonna keep monitoring this situation. Under those facts, this was both reasonable and eminently reasonably explained. Ms. Murphy, what was the nature of the original listing proceeding? Did someone file a complaint or were you given notice? There was information that we voluntarily provided about concerns about the level of demand. Is that because the FDCA has some kind of data sharing? It was really voluntarily. There is a requirement, but the requirement didn't apply here. The requirement applies only in a context where you're no longer manufacturing something, something like that. But really, being a good regulated entity here said, we're having some issues and they were forthright about that with the agency. And so that's kind of how this happened. And so there was always from the start and all throughout this product, this period of time collaboration between the agency and the company because ultimately you want the company that's manufacturing the FDA approved drug to be able to be serving the market if it's possible to do so. But did Lilly oppose the shortage determination? No, not early on. So it was over time that we were the ones who said, hey, we don't think there's a shortage anymore. And we're happy to give you the data to help you. We're going to show you why we don't think there's a shortage anymore. But earlier on in the process, there were supply and demand issues when the drugs came out. They just happened to be even greater demand than had been anticipated. But Lilly worked incredibly hard over the coming year and a half to ensure that it could get its supply up to necessary to meet demand. But there wasn't like a notice or anything? No, and that's what's kind of odd about their argument. I mean, forever, these things have really just been, it goes on the list, it comes off the list. I think what happened here is the agency had to figure out what to do because the agency recognized there was going to be litigation. And so really in service of aiding the courts, said we're going to put out an opinion. We're going to put something out so that you will have something to review to understand why we did this, even though FDA typically just kind of things go on the list off the list. There's not necessarily some big order or process that surrounds that. So I think here, this is actually a product of the agency being, we're going to help you out. We're going to give you an opinion. The closest analog we can find for that is 554, I think it's E, that says you can kind of issue an opinion to clarify doubt. And so they said, this seems to fit into that category. We're going to do this to ensure the court has something to look at, but not because the statute requires some particular formal process for us to take something on or off the list. There's no further questions. Thank you. I'd ask you to affirm. Thanks. I'd like to begin by addressing one of the arbitrary and capricious points that Ms. Tam made. She represented the table four, which is one of the cumulative supply and demand tables, reflect surplus that's available to provide to patients. Lilly actually denied that that was the case. That's on record page 2028. It said that the cumulative supply numbers are actually not reflective of available inventory. And I think that really gets to the fundamental misunderstanding that the FDA has with respect to these cumulative numbers. It's just a 15-month total of whatever happened over that period of time. But the agency never explained why it was looking at a 15-month period. It never explained why it was allowing surplus numbers from the earlier stages of that stale data that was almost a year old at the time of the decision to outweigh shortages or at least shortfalls in production relative to demand that occurred in the more recent months, including the month preceding the decision and all three of the months that Lilly projected into 2025. We addressed this specifically with tables on page 41 of our brief showing that where you start counting, in other words, the length of time that you look at, really does drive whether or not there is a shortage based on this data. If you look at just what Lilly projected, there is a 5 million dose shortage. If you look at the most recent month and add that in, there is a 4.9 million dose shortage. If you go back to October, so the most recent six months, including the projected three months, you have a 1.3 million dose shortage. You know, we don't disagree with the fact that the agency could use cumulative data. I think that's probably one way of getting at this problem. But the agency has to explain the parameters. And I think that gets back to our notice and comment point. It's not enough for the agent to say, well, we're thinking about delisting this or something like that. The agency has to provide some sort of indication of what sort of analysis it's going to undertake. I think in this instance, it certainly could have provided, and in any other context would have had to provide, some indication of the parameters that was applied. I've never heard the defendants represent that the agency couldn't say, we're going to do a 15 month cumulative analysis, and that's what's going to drive our decision. Of course, for what it's worth, the decision actually doesn't say that that's what the agency was doing. But if the agency had actually made that decision, we could have said something about it. For example, you shouldn't give equal weight to things that happened a year ago when you're trying to make a decision that is up to date. Maybe the agency would have agreed with us. Maybe it would have come out with some kind of explanation to explain why it was doing what it was doing. But the point is that all of these fundamental parameters, how the data is structured, where averages are used, if there's an inventory number, why it's taken from random days and is unmatched by any commensurate showing of demand, in fact, all the data is unmatched by commensurate showing of demand except for the cumulative supply and demand table. There are any number of these choices of parameters and presentation, and ultimately, like the formula for deciding whether something is or is not in shortage, that the agency could have, I mean, ought to have explained in its decision, but also could have and should have in a rulemaking context provided notice of, and nobody's ever contended that those were confidential, or that we had any ability to comment on them. I mean, just under the standard logical outgrowth approach, these are the things an agency would have to put on the table. Finally, I'd like to address the prejudicial error argument. As I said, we didn't know what these parameters were. There was no way we could have addressed them. And I think, really, the case that helps us hear the most is City of Arlington where the court did find there was harmless error, but what happened there was the agency published what really was a notice of proposed rulemaking that went on for pages that explained what it was going to do in all the details. In other words, what its reasoning was, the approach it was going to take, it just gave it the wrong label. It called it a notice rather than a notice of proposed rulemaking. You know, for the court to find that there was harmless error here, the court would have to say that it is absolutely clear that there was no procedural or substantive change that would be likely in the outcome of this, and I think the court simply can't find that where there was no Federal Register publication May I complete my sentence, Your Honor? And where none of the parameters were known to any of the parties that were interested in the decision being made. We ask the court to reverse. Thank you.